Cases No. 09-1385 Frank T. Shum v. INTEL CORPORATION Mr. Kersh After remand from this Court, a unanimous jury determined that Shum had proved by clear and convincing evidence that he was a co-inventor of the valuable optoelectronic packaging patents at issue in this case. The District Court did not disturb that finding on post-trial motions, and the appellees have not raised a hint of error about those verdicts. Mr. Shum believed and argued below that those verdicts provided compelling evidence that defendants engaged in their fraudulent misappropriation of his IP rights. The District Court instead granted summary judgment and JMOL against Mr. Shum, despite him proving that he was a co-inventor, and despite defendants' acknowledgment that their assignments were false. They said below, and here in appeal, that Mr. Shum always was a co-inventor of the valuable optoelectronic packaging patents. But he eventually got co-inventorship, didn't he? He did. He got co-inventorship. They have not appealed that issue. They've argued on appeal that because if we prevail on any issues, it shouldn't matter. You're after the $400 million? We're not after $400 million at all. Or at least half? No, not even at least half. We're after what the value of those, that patent was, the exclusive rights in those patents, divided in half. And what exactly was the benefit that they got at the expense of your client, Mr. Shum? The benefit that Mr. Riddell and Light Logic got at the expense of our client? Right. Well, I think there's two different benefits. Okay. Mr. Riddell and Light Logic got significant monetary income, awards. Riddell and Light Logic sold these exclusive rights in the patents because- But the problem is you need some sort of causation or nexus between the two. And I think all of the facts are certainly the overwhelming evidence was that the difference between having sole inventorship and co-inventorship did not result in a change in the way Intel would have reacted in terms of purchasing Light Logic. The point is that all of the evidence on the record demonstrates that Intel and all the inventors needed exclusive rights. They needed exclusive rights in these patents. And- Why? Under the POL, they were told that your client had a right to exploit all of the technology from Radiance. And they were aware of that. But- I mean, why did they need- What evidence is there that they needed exclusive rights? But the evidence is compelling conclusive evidence that they reviewed and relied upon the patent assignments, which said that Intel had exclusive rights, falsely. And the evidence that the- What's the difference of exclusive rights for them? I mean, assuming they're practicing the patents, they have the right to practice the patents irrespective of whether or not there's a co-inventorship issue or not, right? Correct. So I guess I have a hard time seeing tangibly where there's a causation between whether or not they had co-inventorship or sole inventorship and what was purchased and what was done by all the parties here. Please let me explain, Your Honor. The issue in here is not whether they had the right to practice the patents or the rights to use the patents. The issue here is, as in any fraudulent transfer case, what was the property that was sold and who had a right to the proceeds from that property that was sold. The property that was sold here were the entire rights, including Mr. Shum's rights, in the patents. What Intel wanted, what the investors wanted, were the exclusive rights in these patents because they gave a competitive advantage to them by having the exclusive rights. The record is very clear. Mr. Verdell knew it, everybody knew it, that there was no value, absolutely zero value if there were shared rights or non-exclusive rights. And so what Mr. Verdell did, and what LightLogic did, is they falsely, fraudulently, claimed Mr. Shum's rights. So you're saying that the record conclusively establishes that none of these transactions between Vermeer and Intel would have occurred if they had known that he was not, if there was a co-inventorship issue here? I believe, I believe it. What can you point to? Point me to a couple things in the... Well, most importantly, I can point to the, that all of the investors in Intel reviewed the patent assignments and relied upon them, and they were material, as we said in the record. And those patent assignments said that they had exclusive rights... Was there any testimony in the record by anyone that these were material, that they wouldn't have acted as they did in the absence of this? Yes. Yes, I believe there is. I think there is testimony that the representations in the representation, reps and warranties of the merger agreements, which don't disagree, which don't dispute those patent assignments. There's no conflict between those representations and, and the patent assignments. And I, and I take, I disagree, Your Honor, with your position that they were... I haven't taken a position yet. I'm just asking a question. Excuse me. I apologize. I disagree with the, the defendant's position that the, they fully disclosed Mr. Shum's rights below. There is, there is at least a question of fact about what was disclosed, but if a fair reading of all of the merger documents... Well, the question to me isn't so much whether they disclosed Mr. Shum's rights, it's a question of what they represented as being their rights. Right, and I think it's critically important, this is in the record, Mr. Verdell committed such overt fraud, it's almost astounding. He represented to investors and, and Intel that these inventions were invented after he left Radiance, after, so that Mr. Shum would have absolutely no rights in them, so that he should have, he could have the exclusive rights and that he would, could sell them. But if you're, if you're right that Verdell defrauded Shum, why is Intel a defendant? Intel paid the $400 million. So if there was something defective about the rights, wasn't Intel a victim? Intel, we don't know whether Intel was a victim or, or was not early on, they may have been. But later on, it's very clear that Intel itself knew that they did not have the exclusive rights to these patents. They knew that Shum was a co-owner per their own interrogatory responses, and yet they continue to file false and fraudulent patent applications in the PTO. Intel? Intel did. And then Intel also refused to tell Robertson Stevens, a venture capitalist who Shum went to to get money, to get, try to get funding for his co-ownership interests. They refused to tell him that, that, that Mr. Shum had any rights, any, there was anything different than... But Shum got his rights, didn't he? The inventorship was corrected, and doesn't that correct the validity of the patents? And therefore, if the value was based on the patents, the value was properly paid. Your complaint is that Verdell and Lighthouse got Intel's money, and that Shum didn't get any of it. The main complaint is that Verdell and Lighthouse sold the entire bundle of rights, including Shum's 50% ownership rights in those patents. I'm trying to understand, yes, I think that following this line, I thought that the basis for this appeal was some sort of unjust enrichment or the various state law claims that were not permitted to proceed, that Mr. Shum wasn't trying to take everything back, but just felt that he had, because he was either a sole or joint inventor, that he had certain rights which entitled him to share the financial benefits of those rights. And I thought that was your case, that the way the case proceeded, those claims never got to a jury or never got to be litigated. That's correct, Your Honor. Those are our main claims. Mr. Shum was deprauded of his 50% ownership... But why would you have a claim against Intel for any of those? Well, the claim against Intel is twofold. One, it's because they are LightLogic. LightLogic was merged into them as part of this transaction, so they outstand as a second successor and liability to LightLogic. So that's why they are a defendant, number one. Number two, we argue that they could also be an individual defendant because of their own misconduct during and after the merger transaction, where they knew, they learned, Mr. Shum was a co-owner and persisted. But the question isn't, I mean, to the extent there was misconduct in terms of the inventorship question, you've won on that. You've prevailed and you get your co-inventorship. With respect to unjust enrichment and the other claims, you have to demonstrate that there's been some cause and effect in terms of harm to you or unjust enrichment to them. And I absolutely agree with you, Your Honor. And I believe the record is overwhelming that we did it. We demonstrated that these patents and the exclusive rights in the patents were the competitive advantage that LightLogic advertised to investors in Intel. We demonstrated that investors in Intel reviewed and relied upon those patent assignments which falsely gave them the exclusive rights. Your complaint is with Verdeel. Verdeel and his company, LightLogic. Right. Under California law, the court did careful work and held that Verdeel, that shareholders have no fiduciary duty with respect to each other. That, Your Honor, that... And if Verdeel failed in his fiduciary duty to the company they both worked for, that was no business of Shum's. Your Honor, I think the district court made a critical mistake in awarding some of the judgment on the fiduciary duty issue on two issues. They decided, he decided that Mr. Shum already had, earlier in the case, had standing to assert Mr. Verdeel's self-dealing at the expense of the company, Radiance. But then it decided on summary judgment that, as a matter of law, Mr. Verdeel's conduct could not have violated his fiduciary duties to his company, Radiance, because some of it occurred after Radiance was dissolved. But that's not the law. If, for instance, LightLogic, when it was merged into Intel, it had executives that were breaching their fiduciary duties and self-dealing before and after the merger with Intel, LightLogic, or its successor, would obviously have the right to assert that breach of fiduciary duty and seek redress for it. Fundamentally, I think the district court got that issue wrong. There was clearly a question of fact with regard to the issue of fiduciary duty, whether Verdeel breached his fiduciary duty to Radiance, and Shum had standing for that. There's also, under the City of Hope case, it is clear that there is a question of fact when there's a confidential relationship in which there is here. Verdeel and Shum were working together under confidentiality agreements to develop and invent these patents. But were they joint ventures together, or were they co-shareholders in a company? They were co-shareholders, but the co-shareholder issue doesn't... Co-shareholders and directors, co-directors under California law, generally owe fiduciary duties. Were they co-directors? Yes, they generally owe fiduciary duties. The only time they don't is in the unusual circumstances of person where the property that's developed was developed by one of them after they started fighting, after they started buyout negotiations. In this case, the valuable, extremely valuable property was developed and invented well before the buyout negotiations, while they were co-directors and co-shareholders. So I do believe that there were significant errors in many of the district court's decisions. And I want to... But in the P.O.L., they explicitly, even taking everything you say is correct, that they shall have equal rights to independently exploit the intellectual property developed by the corporation. So Verdeel took all those rights away when the company dissolved. Right, exactly. It says they have equal rights to independently exploit those intellectual property rights, which means that Verdeel cannot file fraudulent patent applications or fraudulent patent assignments where he says he has all the rights. He cannot do that. That's unlawful. The language of that in the P.O.L. supports our argument. Well, it may support your argument with respect to co-inventorship, but I'm not clear how it supports your argument with respect to the state law claims or the others. Okay, I apologize, Ramon. And I would like to clarify that the essence of our state law claims is that Mr. Shum, Mr. Verdeel, excuse me, could not take the entire bundle of rights, could not take Mr. Shum's co-ownership rights. He had equal rights to independently exploit, but he had absolutely no rights to claim full inventorship and ownership rights. And to do that is fraud. And that's what he knew he needed from conversations with investors. That's what he hid from Mr. Verdeel, Mr. Shum. And that's what he did. He went out and stole, misappropriated the entire rights by just saying that he had them when he didn't. In fact, what this case is about is Mr. Verdeel told investors, Intel, everybody apparently that these were invented after Rainings was dissolved at first. That's how he got his fraudulent patents and patent assignments. Four years later, two years into this litigation, he switches right before the first inventorship trial and says, oh, I have no evidence these were invented after Rainings. They were given these sole and exclusive rights. They were invented, actually, by me and Mr. Shum before Rainings. Mr. Shum's a co-owner, so I'm going to have to change my arguments. He had absolutely never had any justification for asserting sole and exclusive inventorship or ownership rights. And what he did was fraud to claim them. He knew he needed them. And that's what was a significant factor. We don't know. We have strived to figure out what percentage of that $409 million was due to those exclusive patent rights. They have prevented us from getting them. We have to make motions to compel. And they have argued that we look for anything that's valued, like logics, intellectual property, and those exclusive rights. They refuse to produce them without any justification. I believe my time has expired. Thank you, Mr. Koch. Mr. Lee, are you representing the three main defendants? I am, Your Honor. I'm representing John Marks, Rudeal, Intel, and Light Logic. I'll be addressing the merits of the appeal. Mr. Fleming, my partner, will address the cost appeal, which is this next thing up on the docket. Respectfully, I think what Your Honors have heard is the problem that confronted the district court. At the district court, there were lots of allegations about, here's another bad act, here's another bad act, here's the damage that has been incurred. And Judge Jensen did what he was supposed to do. He went through each of the state law claims, which is the focus of the appeal today, on a disciplined basis and said the following. What is the basis of the claim? And have you proved the elements of the claim? And as to each of the claims that the jury hung on, unjust enrichment, breach of contract, and fraud, he went through and said, what's the basis of your claim, what's the harm, what's the causation? Now, Judge Jensen found in his JMOL order that Mr. Schott had failed on a number of bases. This appeal has more issues, I think, than any appeal I've ever argued before this court. But you know, Mr. Lee, one of the interesting things about our work is we read the blue brief and it looks interesting. This way, so we read the red brief, it's a different case. The blue brief here paints a picture of Mr. Verdeel really running rings around Trump. He procured the abandonment of the one patent with Schum's name on it. He left Schum's name out of at least five where it was finally held that he was a co-inventor. It dissolved the company, Radiance, and I guess assigned the patents to a like logic that was sold to Intel for $400 million based in part on Schum's work, who was obviously found to be a co-inventor of five of those patents. And he ends up with nothing. Well, Your Honor, there's a reason for that. That's the reason we get the red brief. That's the red brief. That's the red brief. And Your Honor, the chronology here tells a lot. Let me talk just briefly about the chronology because I think it goes directly to the causation and harm issues on the state law claims. These two gentlemen formed their company on April 21st, 1997. By August, it was over. By August, each of them, both sophisticated people had gone out. Mr. Schum had Coudere brothers and the record before the court demonstrates he considered every major firm in California to represent. By September, each of them were making plans to dissolve the corporation and go their own ways. Each of them were talking to folks individually. On September 29th, 1997, so literally four months after they had started, Mr. Schum is sending a business plan to a third party and it's called Radius, the same name as the company, and saying, take a look at this. This is what I want to use to compete with Mark, Dr. Verdeel. This is a factual situation that has two important components. The marriage was brief. It was no more than four months. When they dissolved the marriage, they did it by engaging sophisticated advisors, going out broadly, and entering into a P.O.L. that is, as Judge Prost said, very specific about the rights. Everybody walked away. And it's very detailed. It even talks about who's going to pay the credit card. The second set of facts that's important is this. What happens after the P.O.L. has been signed? And the difference is this. Mr. Schum tries to go forward and he concedes, on the record, without dispute, that nothing that Dr. Verdeel did during the four months he tried to make a go of it interfered with his ability to go forward in any way. Dr. Verdeel went forward on his own, sitting in his house, in his bedroom, working, and came up, ultimately, with a new product, an important new product, a transponder, and in the progress of developing that, he got one level of financing, a second level of financing. Are you saying the whole $400 million transaction had basically nothing to do with the at least five patents on which Schum was a co-inventor? Your Honor, I don't think we would ever go so far as to say that it has nothing to do. What I would say is this, to go to Judge Prost's question, to Mr. Kirsch. In the record, 827605, there is the schedule of intellectual property that was sold by LightLogic. Mr. Verdeel, you are presenting a lot of very interesting factual points and asking us to decide that this had value or this had no value or there were no mutual obligations. But where I have trouble is that when the jury hung on these questions with the witnesses before them with the opportunity for all of these facts to come out, more than 15 minutes per side, that it was hung so the judge said, never mind, I'll decide. And that seems to me to be somewhat irregular. Can you justify that? You're telling us how to justify it by telling us the facts on one side. We haven't heard the facts on the other side. Well, Your Honor, I actually can answer that question, which is this. JMOL exists so that a district court judge can find that a jury has either hung and not rendered a verdict or, in fact, had rendered a verdict. And, in fact, the jury could have, but didn't, have found that there was liability under the state law claims and the judge, as a matter of law, could have taken that away JMOL. That is what JMOL exists for. It is for those circumstances where the substantial evidence doesn't support the verdict. It seems to me that when a jury hangs, that's one step further away. And what the judge is saying, the jury hung, I'm now going to look at the undisputed facts and I'm going to render judgment as a matter of law. And the reason that's important, Your Honor, and relevant to the facts I was trying to give Judge Lori is this. Well, let me just stop you because you're telling us we're looking at undisputed facts. I didn't say that these facts were undisputed. Your Honor, I think that if we go to the specifics that Judge Jensen focused upon in his JMOL order, you will find that they are undisputed. And let me give you two examples if I could. On unjust enrichment, one of the facts that was undisputed was that the claim, the claim made by Mr. Shaw was that there had been a claim of exclusivity and that that caused him damage. As I was saying a minute ago, at 827-605 you will see that there was no claim of exclusivity. In fact, LifeLogic and Dr. Verdiel revealed to Intel just what was in the POL. But set that aside, this Court's decision in the cyanamide case says that if your claim is exclusivity, then you have to prove the damages that have resulted from that and causation for that. Yes, but that wasn't the only issue that was being raised in terms of unjust enrichment. No, Your Honor. No, actually that is the claim. The claim on unjust enrichment. That's why I say respectfully to Mr. Kirsch that it's important to focus upon the precise allegations because for unjust enrichment, it was a claim of exclusivity. For breach of contract, it was a claim of patenting by an equitable conduct. And for fraud it was the statement made that the original application had to be withdrawn. That we would suggest it's very important to focus upon them because the district court required the parties to say precisely what their claims were. On unjust enrichment, the focus, the claim, was exclusivity. We think the undisputed record, no reasonable jury could have found that was the basis of the claim. But even if it had. But at that time, it was known that these were at least joint inventions. If not, at least in the first case, the exclusive invention of Shum. Your Honor, the co-inventorship determination had not been made. But everybody knew what the P.O.L. said. Now whatever co-inventorship was, it gave them equal rights to exploit the technology. It gave them the right to exploit the technology even if they were competing with each other. And it gave them the rights to exploit the technology even if they were competing with radio. But if we accept that the jury found that this technology was improperly represented to be the sole invention of one person when it was a joint invention, then what you're asking us to build on is on a premise which has already been diminished. Your Honor, that may be the place I'm failing to communicate. The jury didn't find that. All the jury found was that he was a co-inventor on claims. Can you say how many other questions? That's what troubles me as to how now to decide as a matter of law no reasonable jury could have found any substance in those issues. Your Honor, this is where a it's like the Carter case that was recently decided by this Court. There's an embedded federal issue that happens to be in inventorship here. That may get resolved one way or another. That doesn't take care of all of the other requirements of a state law claim. Let me give you two examples. On the breach of contract claim, they say the breach was that Mr. Dr. Verdiel filed patent applications and procured them by inequitable conduct. We said in our red brief there's no damage. There's been no proof of harm or causation. And if the defendant refused to provide investment bankers with a written acknowledgment of Shum's proprietary interest, that's the only harm or causation evidence that they rely upon. If Your Honor    record appendix, you will see that Mr. Shum's written acknowledgment of Shum's proprietary interest is the only harm or causation     acknowledgment of Shum's proprietary interest, that's the only harm or causation evidence that they rely upon. If the defendant refused to provide investment bankers with a written acknowledgment of Shum's  that's the only harm or causation evidence that they rely upon.  refused to provide investment bankers with a written acknowledgment of Shum's proprietary interest, that's the only harm or causation evidence that they rely upon. If the defendant refused to provide investment bankers with a written  proprietary interest, that's the only harm or causation evidence that they rely upon. If the defendant  investment bankers with a written acknowledgment of Shum's proprietary interest, that's the only harm or causation evidence that they rely upon. And the scope of the discovery they permitted. There was nothing that prevented them formulating an opinion as to what the value of exclusivity was. Well a lot of your argument seems to depend on your suggestion that any rights to co-inventorship are kind of co-extensive with the P.O.L. rights. There's a difference between what he gets as a co-inventor and what he got under the plan of liquidation. I think two interesting things, Your Honor, is one is I think that's correct, although the argument they make to you on jurisdiction today would suggest that maybe that's not true, but I would suggest seven years after the fact, after two trials and two appeals to this Court, there's a reason this jurisdiction issue hasn't been raised before today. The Larson case would suggest they may not be co-expensive, that there's an economic component and there's also a reputation component. That in fact may well be true. The focus here in the state law claims was benefiting from the economic component. And I think the one place where Mr. Shum and we agree is to the extent he wanted to exploit the economic component, they are co-extensive. He could have done There's a reason that Except to the extent that part of the $400 was in those patents. Your Honor, it's the extent that as part of the $400 million that some portion of his co-inventorship might be there, but there's no dispute that whatever portion of his that was in there was done before the P.O.L. As a result of the P.O.L., both of them had the right to exploit and use whatever had been invented before. You're saying if subsequent sale was envisioned, if Shum would have had any rights to proceeds from the subsequent sale, that had to have been dealt with in the P.O.L. And since it wasn't, there are no proceeds. I would suggest two things. I would suggest it in fact was dealt with in the P.O.L. which is when they got divorced, they said they knew they were both going off on their independent ways and they would be separate. The second is even if they were co-inventors as Judge Newman and I discussed, the fact of the matter is under 35 U.S.C. 262, they had independent rights to exploit their co-inventorship. They had independent rights to exploit but it was never clear to me whether in fact as tenants in common, despite the independent rights to exploit, the standard property rules of sharing the proceeds might come into effect. Your Honor, I don't think so for two reasons. One is to the extent that there is a question, the answer, my red light is on, so I'll answer the question. Two things, Your Honor. Under Section 262, they have an independent right to exploit, license, do whatever they want with their interest without accounting to the other. But that's really the major aspect of the argument, isn't it, that by concealing the joint interests that the whole process was changed? Your Honor, that is the predicate that's false. Let me read you the sentence that was disclosed, that was in the disclosure to Intel. Pursuant to the Radiance Design and Plan of Liquidation approved by the Board of Directors of Radiance in January 1998, Frank Shum and Jean-Marc Verdiel were given equal rights to independently exploit the intellectual property developed by Radiance Design including the rights to one patented edition. In other words, Shum could have sold his share of the patents to Intel for $400 million. Shum could have not only done that, he could have tried to use the technology and build a company like LightLogic. He did for two months and he stopped. Thank you, Your Honor. Okay. Thank you, Mr. Lee. Mr. Kirsch, we have a couple of minutes for rebuttal. We'll take the time out of the next case, which doesn't seem to be quite as complicated. Thank you, Your Honor. Just a few points in response to Mr. Lee. I'm not sure we agree on as many things as Mr. Lee suggests. And I think Your Honor's point about the red and blue grease and the difference in evidence suggested in the grease is the heart of this appeal because both the JOL and the summary judgment that were entered against Shum in this case required the District Court to view all evidence and inferences in Mr. Shum's favor. And the Court didn't do that. One specific instance, he brought up the Robertson-Stevens issue. Robertson-Stevens, the venture capitalist who Mr. Shum talked to and tried to get funding after the Intel merger, that evidence was not excluded. The evidence was truncated by the District Court. It was presented to the jury. And the reasonable inference from this, that is exactly what occurred. Intel would not allow Mr. Shum to go forward and get funding based on his co-inventorship rights after the merger because they falsely claimed exclusive rights. They knew they didn't have them, and they did. And yet they went ahead and prevented Mr. Shum from exercising his rights. Another critical point is Mr. Lee made the point that nobody valued the exclusivity in this case. But Mr. Lee forgets that all of the evidence in this case was that shared rights, non-exclusive rights, were worthless. That's what Mr. Verdell knew. That's what Mr. Shum knew. That's what everybody knew. And the only value for these patents in this case... I don't understand your point. Everybody knew that shared rights were worthless? That's exactly what... In other words, everything that came out of the P.O.L. was worthless because they were getting the shared rights to exploit the patents. That's absolutely right. Mr. Verdell and Mr. Shum tried at the beginning when they separated to both get funding for their shared rights and they couldn't do it. They couldn't do it because they were shared. So Mr. Verdell went out and said, you know what? If Mr. Shum has rights under the P.O.L., I'm going to lie and say that these inventions were made afterwards, improvements, so that I would have the exclusive rights. And that's what he did. And so the disclosure of the P.O.L. was... It's a red herring. Because he did not... Mr. Verdell told all the investors and Intel in the merger agreement, it's in our briefs, that these inventions were created after LightLogic was established. He lied. Doesn't that statement refer to the patents at 567? I mean, one of those patents that are at issue here. Mr. Verdell only said... Excuse me, Your Honor. Mr. Verdell only made representations to the investors and Intel that Mr. Shum had rights in the first patent, the 567. Used rights, not ownership rights or rights to sell, but he had used rights in that. He had more than those. That's the only disclosure he made. The only... The disclosures that he made to investors and Intel read fairly, read especially in light of the fraudulent patent assignments through which the defendants claimed falsely that they had the exclusive rights, was that Mr. Verdell had all of the rights when he didn't. And so that's what this case is about. This case is about overt stealing and misappropriating somebody's half-interest and patent rights by lying to the patent office, to investors and merger documents, and there is absolutely no justification for a jury not to decide what the value of that unjust enrichment by defendants was. Okay. Let's deem this appeal complete and we'll try and figure it out. And we'll start on the next one.